UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Tamara Allen | § | |
| *Plaintiff* | § | |
| | § | Civil Action No.: |
| *versus* | § | SA:24-cv-00157-XR |
| | § | |
| Experian Information Solutions, | § | |
| Inc., and USAA Federal Savings | § | |
| Bank | § | |
| | § | |
| *Defendants* | § | |

Plaintiff's First Amended Complaint

_____

## Introduction

1. A credit report can determine everything from whether a person can secure a credit card, purchase a home, win a new job, or start a small business. Recognizing the importance of accuracy in credit reporting, Congress adopted the Fair Credit Reporting Act in 1970 (FCRA).

2. Inaccurate credit reports can directly impair the banking system, while unfair credit reporting methods undermine public confidence, which is essential to the continued functioning of the banking system.

3. The FCRA seeks to promote accuracy, fairness, and privacy in consumer reporting. It imposes duties on consumer reporting agencies as they assemble and evaluate consumer credit information. The FCRA also imposes duties on furnishers - the sources that provide credit information to credit reporting agencies.

4. Tamara Allen brings this action to challenge the actions of USAA, Equifax Information Services, and Experian Information Solutions regarding their misrepresentations of Allen's liability for fraudulent debts that were a result of identity theft. Allen alleges these misrepresentations by the Defendants caused damages.

5. Allen makes these allegations based on personal knowledge for aspects related to herself. For other matters, she makes the allegations on information and belief. While many violations are described specifically, this complaint alleges violations of the Fair Credit Reporting Act (FCRA) in its entirety.

6. Allen brings this action as a victim of identity theft to challenge the defendant's unfair and inaccurate reporting of fraudulent debts.

## Jurisdiction and Venue

7. Jurisdiction of this Honorable Court arises pursuant to 15 U.S.C. § 15

U.S.C. § 1681.

8. This action arises out of Defendants' violation of the Fair Credit
Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA").

9. Experian maintains significant business operations in the state of
Texas, including a dispute resolution center.

10. USAA is incorporated in Texas and maintains its headquarters in
San Antonio.

11. Because Defendants conduct business and maintain significant
business operations within the State of Texas, personal jurisdiction is
established.

12. Venue is proper pursuant to 28 U.S.C. § 1391 for the following
reasons: (i) Plaintiff resides within this judicial district; (ii) the
conduct complained of herein occurred within this judicial district;
and, (iii) Defendants conducted business within this judicial district
at all times relevant.

Parties

13. Plaintiff, Tamara Allen, is a natural person who resides in
Montgomery County, Texas.

14. Defendant, Experian Information Solutions, Inc., is an Ohio corporation whose mailing address is 475 Anton Blvd. Costa Mesa, California 92626-7037. Experian has been served and has filed an answer.

15. Experian is a consumer reporting agency as that term is defined by 15 U.S.C. § 1681a(f)

16. It is one of the "Big 3" credit reporting agencies.

17. Experian is a "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" as that term is defined by 15 U.S.C. § 1681a(p).

18. Defendant, USAA Federal Savings Bank, is a Texas corporation whose mailing address is PO Box 690286 San Antonio, Texas 78269-0286. USAA has been served and has an answer on file.

19. USAA reports or "furnishes" information to consumer reporting agencies, including Experian, Trans Union, LLC. and Equifax.

20. USAA reports that data to the national credit reporting agencies using a standardized industry format on a monthly basis.

21. That format, known as "Metro 2," is established by a credit

reporting industry trade group, controlled by Equifax, Experian, and Trans Union.

22. That industry trade group is known as the Credit Data Industry Association, or CDIA.

23. As part of its agreement with the national credit reporting agencies, USAA agrees to report all of its credit data on a monthly basis to those agencies in the Metro 2 format, and to adhere to the standards set forth in that format.

24. All accounts must be reported a minimum of once per month.

    \*\*\*

    When reporting delinquent accounts, the "Industry Standard for Reporting Account Delinquency" must be followed.
    2020 Credit Reporting Resource Guide at 2-2.

25. The Metro 2 format provides the capability for data furnishers (like USAA) to report up to 24 months of historical payment history.

    The Payment History Profile (up to 24 months) makes it possible for the credit grantor to supply automated updates/corrections for the file rather than costly manual updates/corrections, and reduces consumer disputes.
    2020 Credit Reporting Resource Guide at 2-1.

26. USAA is not a reliable source of credit reporting data and has in past provided inaccurate banking and credit account information and is

the subject of Consumer Financial Protection Bureau, Attorney General, and Better Business Bureau complaints for fraudulent credit activity in the names of consumers.

27. USAA furnishes data to Experian under an agreement with Experian, known colloquially within the industry as a "service," "contributor," or "subscriber" agreement.

28. That agreement sets forth the terms and conditions under which USAA provides data to Experian.

29. That agreement also provides statutorily-required notices to USAA concerning its responsibilities.

30. That agreement also provides a framework for USAA's contribution and correction of inaccurate data including:

    a.  to only provide accurate information.

    b.  to remove inaccurate information

    c.  to respond to disputes about USAA in response to notices sent by Experian to USAA.

    d.  to timely respond to disputes.

31. The agreement also sets forth Experian's rights and duties relative to the data furnished by USAA.

32. The subscriber agreement also contains disclaimers of accuracy of reports provided by Experian, to USAA in contravention of Experian's duties under the FCRA.

33. As part of its relationship with USAA, Experian has agreed to the conditions under which certain disputed accounts may be deleted from a consumer's report without the agreement of USAA and when those accounts may remain over the objections of the consumer.

34. As a furnisher USAA is required by 15 U.S.C. § 15 U.S.C. § 1681s-2(b), in response to a dispute, to conduct an investigation and modify, delete, or block information it finds to be inaccurate or incomplete.

## Facts

35. Prior to June of 2020, Tamara Allen enjoyed a banking relationship with USAA and a friendship with Elisa Pasvogel.

36. Around June of 2020, USAA became aware that charges associated with Allen's account may not have been incurred by Allen.

37. At that time USAA contacted Allen and asked if recognized charges on one of her USAA credit cards. She told USAA that she did not recognize the charges and that they were not made by her. USAA deemed them as fraudulent charges and deactivated the card number so charges could no longer be made on it.

38. One of the merchants where unauthorized charges were made was Royal Exotics Rentals. It is a San Antonio business that rents exotic cars. Allen has never used this service and was not aware of it before these charges were brought to her attention.

39. Shortly thereafter another of Allen's USAA cards began reflecting unauthorized charges. Some of the merchants on these transactions were the same as the prior card. USAA again alerted her to this and the card was deactivated. USAA suggested that her card may have been skimmed at a nearby gas station.

40. Another USAA card began reflecting charges that Allen did not make. USAA contacted her and following their conversation the card was deactivated.

41. Shortly after this, Allen's AMEX business card was used by the identity thief to charge a Lyft transaction. AMEX notified her and

the card was deactivated.

42. On July 4, 2020, Allen's replacement USAA card was charged for over $8,000. The merchants in these transactions were some of the same in previous unauthorized transactions.

43. This pattern continued. Allen's replacement cards were used to make unauthorized transactions.

44. After the second round of unauthorized charges, card deactivation, and replacement, USAA began an investigation in earnest.

45. Following its investigation, USAA reported back to Allen that Elisa Pasvogel was the identity thief who had made the unauthorized charges.

46. At the time of the start of Pasvogel's identity theft, all of Allen's USAA credit cards were not carrying a balance. The only charges on the cards were those made by Pasvogel.

47. Pasvogel had been a good friend of Allen's for 15 years. In the Spring of 2020, she had been staying with the Allens off and on.

48. Following USAA's report to her Allen believes during this time Pasvogel betrayed her trust by stealing her and her husband's

identity, computer credentials, and/or credit card numbers.

49. After USAA told Allen that Pasvogel had made the charges, Allen called 911. She reported the crime to with the Montgomery County Sheriff's Office.

50. The Sherriff's Office conducted an investigation. It contacted Pasvogel, who promised to pay Allen back and cover all the charges she made. Pasvogel never did. The Sherriff concluded that Pasvogel had used Allen's identifying information to make unauthorized charges on her credit cards.

51. It produced, with evidence it obtained as part of its investigation, a 52-page report detailing the identity theft. A small sample of the report reveals the depth of the investigation, and the sheriff's conclusion (with redactions per Rule 5.2.):

> Contact was made with the manager of Royal Exotics.  Mejia, Sabas W/M 032 The manager was able to provide 10 receipts with Elisa's signature using a credit card belonging to the victim Tamara totaling 16,154.99. The manager also provided the copy of Drivers license the Defendant used. An Arizona DL # ████417. Which belongs to an Elisa Carolina Pasvogel ████1984. The manager also provided a copy of the insurance card. Geico policy Number ████41-68 showing a 2014 Maserati as the covered vehicle and the operators are Elisa Carolina Pasvogel and a Bobby Hamilton.
>
> I was able to determine that Elisa fraudulently charged the Complainant credit cards $17,414.26 in 12 different transactions. I have reason to believe and do believe that Elisa is also responsible for the other fraudulent transactions.

52. In late 2020, Ms. Pasvogel was charged with fraudulently possessing

items of identifying information belonging to Mrs. Allen. See Ex.'s A & B.

53. Mrs. Allen believed that once Ms. Pasvogel was prosecuted, her problems would come to a quick end.

54. Her belief was mistaken; the fraudulent charges began appearing on her credit reports. She started receiving collection letters on these debts from American Coradius International, LLC.

55. Allen contacted USAA by phone and certified mail. USAA had changed its mind, and it was now telling Allen she was now responsible for the charges it once told her were fraudulent.

56. She tried working with USAA to get the charges removed. They refused. Frustrated, she began disputing the information with the credit bureaus.

57. She hired a credit repair company to help. They sent dispute letters and when USAA did not clear up the inaccuracies, they gave up and refunded her.

58. She hired a lawfirm to help. They sent several dispute letters, none of which resolved the USAA reporting.

59. Some of these disputes included a copy parts of the Montgomery County Sherriff's Office's police report which constituted an "identity theft report" for purposes of the FCRA, 15 U.S.C. § 1681a(q)(4) and Regulation V, 12 CFR Part 1022.3

60. One dispute dated July 13, 2022 included six pages from the report and a letter asking that Experian block, under 15 U.S.C. § 1681c-2 the information resulting from identity theft. It did not.

61. She made a complaint to the CFPB. Nothing worked. In early 2023 Allen's disputes began in earnest.

62. In letters dated February 2, 2023, she disputed the inaccurate information with each of the "Big 3" credit bureaus—Experian, Equifiax, and TransUnion. Her letters included:

    a. Copy of her state ID;

    b. A recent toll bill showing her current address;

    c. A copy of her social security card;

    d. An official copy of the 52-page Montgomery County Sherriff's Report concerning the id theft;

    e. A letter from Montgomery County District Attorney's Office,

dated November 13, 2020;

    f.  A letter sent to USAA, dated January 23, 2023;

    g.  A letter she received from the USAA concerning the accounts;

    h.  Enclosures from the letter mentioned above from the original creditor;

    i.  Copy of the CFPB Complaint she made, dated April 22, 2022; and

    j.  A copy of the relevant credit report showing the inaccuracies.

63. The letter and its enclosures provided each bureau more than enough information to verify the identity of Allen and to recognize the disputed accounts as the result of identity theft.

64. As required by the Fair Credit Reporting Act at 15 U.S.C. § 1681i(a)(2) within five days of receipt each bureau forwarded Allen's letter and all enclosures to USAA.

65. Following the February 2, 2023 letters to each of the Big 3 bureaus, USAA received each dispute letter and the enclosures.

66. Per 15 U.S.C. § 1681i, each of the Big 3 bureaus conducted a reinvestigation in response to Allen's dispute.

67. Per 15 U.S.C. § 1681s-2(b), USAA conducted an investigation in response to Allen's disputes.

68. Following its investigation USAA verified the charges it once classified as fraud as complete and accurate to each of the bureaus.

69. Based on Allen's disputes, and in spite of USAA's verification, TransUnion recognized what she had been explaining and documenting—the charges were fraudulently made—by a criminal.

70. TransUnion acted as a reasonable credit reporting agency. It removed the id theft accounts from Mrs. Allen's credit reports. Mrs. Allen sent her last certified letter to TransUnion on February 2, 2023. On February 8, 2023, they sent her the dispute results confirming the removed the accounts from her report.

71. Trans Union forwarded a notice to Experian and Equifax informing those consumer reporting agencies that it had investigated Ms. Allen's allegations of fraud and deleted the disputed USAA information.

72.  Consistent with its agreement with USAA, Experian did not act like a reasonable consumer reporting agency. When confronted with overwhelming evidence of identity theft, Experian failed to remove or block the disputed accounts from Mrs. Allen's credit report.

73.  Thus, Allen sent another set of dispute letters to Experian and Equifax. Her letter to Experian, with enclosures, was 119 pages. It contained a copy of her first dispute and all enclosures to that dispute.

74.  Experian received these letters, read them, and did not remove or block the disputed id theft accounts.

75.  Allen applied for credit and was turned down. The adverse action letters she received from potential creditors referred to the id theft accounts as the reason she was turned down.

76.  Frustrated with the results of her letter writing campaign, Allen called Experian on June 26, 2023 to speak to a customer service representative to see if there was anything more she could do to have it recognize the charges as identity theft.

77.  After several attempts to connect with a live person, she was eventually connected with an agent in Costa Rica. She identified the

accounts she had disputed and confirmed that Experian had received her prior disputes.

78. The agent told her that USAA confirmed the accounts as accurate, stated that USAA had the final word, and that there was nothing that Allen could provide to change Experian's reporting.

79. Allen's police report met all the requirements of the Fair Credit Reporting Act. Experian's refusal to accept it was an act of willful ignorance.

80. Following these calls, in July 2023 she received credit reports from Experian still containing the accounts that are the result of identity theft.

81. As a direct and proximate result of Defendants' willful action and inaction, Plaintiff has suffered actual damages, including, but not limited to, reviewing credit reports, preparing and mailing dispute letters, loss of credit, loss of ability to purchase and benefit from credit, increased costs for credit and insurance, deterrence from applying for credit, mental and emotional pain and anguish, and humiliation and embarrassment of credit denials. Plaintiff has further spent countless hours and suffered pecuniary loss in attempting to

correct Defendants' inaccurate and derogatory information, without
success.

## Causes of Action

*Willful Violation of the Fair Credit Reporting Act Against Experian Information*
*Solutions, Inc.*

82. Experian is a consumer reporting agency under 15 U.S.C. § 1681a(f).

83. When a consumer disputes the accuracy of an item reported by a
credit reporting agency, the agency must check with both the original
sources and with reliable sources of the disputed information. A
CRA cannot rely solely on a furnisher's investigation. 15 U.S.C. §§
1681e(b); 1681i.

84. When a credit reporting agency receives the information required by
15 U.S.C. § 1681c-2(a) it "shall block the reporting of any
information in the file of a consumer that the consumer identifies as
information that resulted from an alleged identity theft" within 4
business days.

85. Here, Experian received, as early as July 2022, and repeatedly
thereafter, information sufficient to trigger its duty to block identity
theft information and to investigate Plaintiff's disputes, correct

Plaintiff's credit report, and provide her dispute or a summary thereof on her credit report.

86. As a result of Experian's willful violations of the FCRA, Experian continued to report false and highly derogatory information on Plaintiff's consumer credit report.

87. Because of Experian's willful violations of the FCRA, Plaintiff suffered, and continues to suffer, damages including damage to her reputation, damage to her credit score, increased cost of credit, denials of new credit, worry, and stress.

88. Experian's failure to comply with the FCRA was willful and violated 15 U.S.C. § 1681n.

89. Per 15 U.S.C. §1681n Plaintiff seeks recovery of her actual damages, punitive damages, and reasonable attorney's fees and costs of the action.

*Negligent Violation of the Fair Credit Reporting Act Against Experian Information Solutions, Inc.*

90. Experian is a consumer reporting agency under 15 U.S.C. § 1681a(f).

91. When a consumer disputes the accuracy of an item reported by a

credit reporting agency, the agency must check with both the original sources and with reliable sources of the disputed information. A CRA cannot rely solely on a furnisher's investigation. 15 U.S.C. §§ 1681e(b); 1681i.

92. When a credit reporting agency receives the information required by 15 U.S.C. § 1681c-2(a) it "shall block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft" within 4 business days.

93. Here, Experian received, as early as July 2022, and repeatedly thereafter, information sufficient to trigger its duty to block identity theft information and to investigate Plaintiff's disputes, correct Plaintiff's credit report, and provide her dispute or a summary thereof on her credit report.

94. As a result of Experian's negligent violations of the FCRA, Experian continued to report false and highly derogatory information on Plaintiff's consumer credit report.

95. Because of Experian's negligent violations of the FCRA, Plaintiff suffered, and continues to suffer, damages including damage to her

reputation, damage to her credit score, increased cost of credit, denials of new credit, worry, and stress.

96. Experian's failure to comply with the FCRA was negligent and violated 15 U.S.C. § 1681o.

97. Per 15 U.S.C. §1681o Plaintiff seeks recovery of her actual damages, and reasonable attorney's fees and costs of the action.

*Willful Violation of the Fair Credit Reporting Act Against USAA Federal Savings Bank*

98. USAA Federal Savings Bank provides information about consumers to credit bureaus, including Equifax and Experian.

99. As an entity who furnishes this information USAA must comply with the Fair Credit Reporting Act.

100. The Fair Credit Reporting Act at 15 U.S.C. § 1681s-2(b) puts specific duties on furnishers when they receive a notice of dispute from a credit bureau.

101. After receiving a dispute from a credit bureau pursuant to section 1681i(a)(2), USAA was required to conduct an investigation with respect the disputed information.

102. At the time it received notices of Allen's disputes USAA had in its possession significant information concerning the disputed transaction.

103. Its fraud department knew the charges that were disputed were the result of fraud.

104. In addition, it received the 52-page report from the Mongomery County Sherriff's Department.

105. USAA received at least seven notices of Allen's disputes. In early 2023 each of the Big 3 forwarded Allen's disputes. In March it received disputes of the same information from Experian and Equifax. Following her June phone calls, USAA should have received notice of another dispute from both Equifax and Experian.

106. Using the information it already possessed and the information provided by the Big 3 credit bureaus, USAA chose to verify information it knew was not accurate or complete and misrepresented it as accurate and complete in violation of the Fair Credit Reporting Act.

107. USAA's failure to comply with the FCRA was willful and violated 15 U.S.C. § 1681o.

108. Per 15 U.S.C. §1681o Allen seeks recovery of her actual damages, punitive damages, and reasonable attorney's fees and costs of the action.

*Negligent Violation of the Fair Credit Reporting Act USAA Federal Savings Bank*

109. USAA Federal Savings Bank provides information about consumers to credit bureaus, including Equifax and Experian.

110. As an entity who furnishes this information USAA must comply with the Fair Credit Reporting Act.

111. The Fair Credit Reporting Act at 15 U.S.C. § 1681s-2(b) puts specific duties on furnishers when they receive a notice of dispute from a credit bureau.

112. After receiving a dispute from a credit bureau pursuant to section 1681i(a)(2) USAA was required to conduct an investigation with respect the disputed information.

113. At the time it received notices of Allen's disputes, USAA had in its possession significant information concerning the disputed transaction.

114. Its fraud department knew the charges that were disputed were the result of fraud.

115. In addition, it received the 52-page report from the Mongomery County Sherriff's Department.

116. USAA received at least seven notices of Allen's disputes. In early 2023 each of the Big 3 forwarded Allen's disputes. In March it received disputes of the same information from Experian and Equifax. Following her June phone calls, USAA should have received notice of another dispute from both Equifax and Experian.

117. Using the information it already possessed and the information provided by the Big 3 credit bureaus, USAA chose to verify information it knew was not accurate or complete and misrepresented it as accurate and complete in violation of the Fair Credit Reporting Act.

118. USAA's failure to comply with the FCRA was negligent and violated 15 U.S.C. § 1681n.

119. Per 15 U.S.C. §1681n Allen seeks recovery of her actual damages and reasonable attorney's fees and costs of the action.

## Jury Demand

120. Pursuant to the Seventh Amendment to the Constitution of the
United States of America, Plaintiff is entitled to, and demands, a trial
by jury.

## Prayer

Plaintiff prays this Court enter judgment against each Defendant for:

a. An award of actual damages, in an amount to be determined at trial
of damages of a maximum of $1,000 pursuant to 15 U.S.C. §
1681n(a)(1)(A) against Defendant for each incident of willful
noncompliance with the FCRA;

b. An award of punitive damages, as the Court may allow pursuant to 15
U.S.C. § 1681n(a)(2), against Defendant for each incident of willful
noncompliance with the FCRA;

c. An award of costs and reasonable attorney's fees, pursuant to 15
U.S.C. § 1681n(a)(3), against Defendant for each incident of willful
noncompliance with the FCRA;

d. An award of actual damages, in an amount to be determined at trial
pursuant to 15 U.S.C. § 1681o(a)(1) against Defendant for each
incident of negligent noncompliance of the FCRA;

e. An award of costs and reasonable attorney's fees, pursuant to 15

U.S.C. § 1681o(a)(2), against Defendant for each incident of

negligent noncompliance with the FCRA; and

f. Any and all other relief the Court deems just and proper.

Dated: April 30, 2024                      Respectfully Submitted,

*/s/William M. Clanton*
William M. Clanton
Texas Bar No. 24049436

Law Office of Bill Clanton, P.C.
926 Chulie Drive
San Antonio, Texas 78216
Phone: (210) 226-0800
Fax: (210) 338-8660
Email: bill@clantonlawoffice.com

Ian B. Lyngklip P47173
LYNGKLIP & ASSOCIATES,
CONSUMER LAW CENTER,
PLC
13751 W. 11 Mile Road
Oak Park, MI 48237
Ian@ConsumerLawyers.com
(248) 208-8864

Attorneys for Tamara Allen